## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **RICKY CHARACTER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:13-cv-02749-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| ***Acting Commissioner, Social*** | : | |
| ***Security Administration,*** | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Ricky Character ("Plaintiff") brought this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration ("the

Commissioner") denying his application for Disability Insurance Benefits ("DIB")

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  [*See* Dkt. Entries dated Sept. 18, 2013].  Therefore, this Order constitutes a final Order of the Court.

under the Social Security Act.[2]  For the reasons below, the undersigned **AFFIRMS** the final decision of the Commissioner.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB in June 2009, alleging disability commencing on May 17, 2006. [Record (hereinafter "R") 116].  Plaintiff's application was denied initially and on reconsideration.  [*See* R99-100].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R112-15].  An evidentiary hearing was held on January 24, 2011.  [R51-96].  The ALJ issued a decision on April 12, 2011, denying Plaintiff's application on the ground that he had not been under a "disability" at any time through the date of the decision.  [R37].  Plaintiff sought

------

[2]      Title II of the Social Security Act provides for federal Disability Insurance Benefits.   42 U.S.C. § 401 *et seq*.   Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for Supplemental Security Income Benefits for the disabled ("SSI").  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on July 27, 2012, making the ALJ's decision the final decision of the Commissioner. [R21-24].

Plaintiff then initiated action in this Court on August 19, 2013, seeking review of the Commissioner's decision.[3] [*See* Doc. 1]. The answer and transcript were filed on December 24, 2013. [*See* Docs. 6, 7]. On February 10, 2014, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 10], on March 13, 2014, the Commissioner filed a response brief in support of the decision, [Doc. 11], and on March 26, 2014, Plaintiff filed a reply brief in support of his petition. The Court heard oral arguments on November 13, 2014. [*See* Doc. 14]. The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

---

[3]     Pursuant to an extension of time granted by the Appeals Council, Plaintiff's action was timely filed. [*See* R1-3].

3

## II.     STATEMENT OF FACTS[4]

### A.     Background

Plaintiff was born on December 1, 1966, and therefore was thirty-nine years old on his alleged onset date and forty-four years old when the ALJ's adverse decision was issued. [R34, 116].  His date last insured was December 31, 2011. [R131].  He has an eleventh-grade education, [R63], and past relevant work as a diesel mechanic, construction worker, painter, and glazier, [R63-65, 138].  He alleges disability due to hip and joint pain and epididymitis.[5] [R137].

### B.     Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that he had last worked on June 6, 2006, as a diesel mechanic. [R64].  He stated that at the time of the hearing, he could not work because of pain. [R66].  He testified that he could walk for ten to fifteen minutes and then his back would "lock up," requiring him to sit for twenty to thirty minutes and let his back release so that he "can move again." [R66].  He stated

---

[4]     In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 10-12].

[5]     Epididymitis is an inflammation of the coiled tube (epididymis) at the back of the testicle that stores and carries sperm.    Mayo Clinic, Epididymitis, http://www.mayoclinic.org/diseases-conditions/epididymitis/basics/definition/con-2 0032876 (last visited 3/27/15).

4

that even when seated, he would have to start shifting position after about twenty to thirty minutes. [R66-67]. He indicated that unless he keeps shifting and moving, his back gets "tighter" and sends pain down through his knees and hips. [R67].

Plaintiff testified that although he was told not to lift more than thirty pounds, he could occasionally lift and carry as much as thirty to forty pounds if a job required it, and he could lift and carry ten to fifteen pounds if he had to do it "over and over again." [R66-68]. Plaintiff also complained of chronic joint pain and said that his medication made him drowsy and put him "out of it" for at least four hours per day. [R69]. He stated his epididymitis did not bother him unless he moved quickly, ran, jumped, or tried to pick up anything heavy, but when he walks he has to "glide." [R71, 87]. When his groin and testicles swell, he has severe pain and is in bed for a couple of days. [R71, 73, 87-88].

As to his daily activities, Plaintiff testified that he wakes at 8:00 a.m., tries to make his bed, fixes a sandwich, watches the news, takes his medicine, and walks to the mailbox or trash can. [R72]. He also reported that he does laundry every two to three days, washes out the tub, and can clean behind himself because he does not want to make a mess. [R72]. He stated that he does not do yard work and that his sister does the grocery shopping and driving. [R72-73].

5

In response to his attorney's questioning about his epididymitis, Plaintiff testified that he visited the emergency room on May 17, 2006, because he had scrotal swelling, hip pain, and joint pain that caused him to be unable to walk.  [R74-75].  He stated that although he went back to work, he missed about five days over the next few weeks and was unable to work after June 6 because "we didn't have light duty."  [R75-76].  He testified that surgery was scheduled in November 2007, but he lost his insurance and could not have the surgery on the date it was set up.  [R76].  He stated that more recently, he had been going to Grady where "they're setting me up with a surgeon." [R76].

Plaintiff testified that he did not have any problems with his memory or ability to stay focused but upon further questioning by his attorney, he stated that he could not stay mentally focused on job tasks for eight straight hours without complaining.  [R81]. He indicated that between the constant pain and the medication putting him "under for at least three or four hours," he would not be able to perform work activities such as lifting, carrying, sitting, standing, or bending on either a frequent or occasional basis throughout an eight-hour day, five days a week.  [R81-84].

6

*C.    Administrative Records*

In a Function Report dated May 4, 2010, Plaintiff indicated that he spent most of the day watching television, [R173], but that he was able to prepare simple meals two to three times per day, take out the garbage, make the bed, do laundry once a week, and shop for groceries, [R175-76]. He stated that he dressed slowly because of his groin pain and that he had to be very careful with his balance when bathing. [R174]. He indicated he took Aleve[6] for pain control. [R173].

*D.    Medical Records*

On May 17, 2006, Plaintiff presented to Dr. Anthony Carter of The Emory Clinic with complaints of severe hip pain. [R200]. Dr. Carter noted extreme point tenderness in the left-hip region and pain with flexion or extension, and he noted that Plaintiff described the pain as nine on a ten-point scale. [R200]. X-rays of Plaintiff's hip

---

[6]    Aleve is a brand name for naproxen, which is used to relieve pain, tenderness, swelling, and stiffness. MedlinePlus, Naproxen, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited 3/27/15).

AO 72A
(Rev.8/8
2)

showed no abnormalities.  [R202].  Dr. Carter prescribed Vicodin[7] and Anaprox[8]

double-strength tablets and referred Plaintiff to Arthur Raines, M.D., at Chastain

Resurgens Orthopaedics.  [R199-200, 223].

Dr. Raines saw Plaintiff on May 23, 2006.  [R223].  Plaintiff's chief complaint

was left-hip pain.  [R223].  He reported that he had difficulty getting out of bed and

difficulty lying on his hip and that he was taking Naprosyn,[9] which had helped.  [R223].

Physical examination showed that Plaintiff was walking with a mild limp and that he

was "exquisitely tender to palpation" in his left hip but that he had full range of motion

in the hip and no significant swelling or increased warmth.  [R223].  Dr. Raines

diagnosed left hip greater trochanter bursitis,[10] directed Plaintiff to take Naprosyn and

---

[7]    Vicodin is a brand name for a combination pain medication containing hydrocodone and acetaminophen.  MedlinePlus, Hydrocodone Combination Products, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html  (last  visited 3/27/15).

[8]    Anaprox is another brand name for naproxen.  MedlinePlus, Naproxen, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html  (last  visited 3/27/15).

[9]    Naprosyn in another brand name for naproxen.  MedlinePlus, Naproxen, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html  (last  visited 3/27/15).

[10]    "Trochanteric bursitis" refers to inflammation of the bursa that covers the bony point on the outside of the hip bone.  A bursa is a small jelly-like sac that usually contains a small amount of fluid and that acts as a cushion between bones and the

8

apply warm compresses to the hip, allowed him to perform all activities "as tolerated," kept him off work, and directed him to return for further evaluation in two weeks. [R223-24, 233]. It was noted that Plaintiff deferred corticosteroid injection. [R223].

On June 6, 2006, Plaintiff returned to The Emory Clinic for follow-up and with complaints of chronic swelling in his testicles that had persisted for several years. [R210, 213]. The same day, he also followed up with Dr. Raines for his hip pain. [R225]. Dr. Raines noted that Plaintiff was doing better when he was taking anti-inflammatory medication and that he had good hip range of motion and less tenderness. [R225]. Dr. Raines directed him to continue with anti-inflammatory medication and warm compresses and took him off work restriction. [R225].

On June 20, 2006, Plaintiff was seen by Emerson Harrison, M.D., at Georgia Urology with complaints of groin pain. [R232]. Notes from July 25, 2006, state that Plaintiff complained of significant pain on the right side of his groin and in the right testicle. [R227]. An ultrasound revealed an enlargement of the right epididymis with a right epididymal cyst and a large hydrocele[11] on the left. [R227]. Dr. Harrison put

overlying soft tissues. Am. Academy of Orthopaedic Surgeons OrthoInfo, Hip Bursitis, http://orthoinfo.aaos.org/topic.cfm?topic=A00409 (last visited 3/27/15).

[11] A hydrocele is backup of fluid around a testicle. MedlinePlus, Hydrocele Repair, http://www.nlm.nih.gov/medlineplus/ency/article/002999.htm (last visited

AO 72A
(Rev.8/8
2)

Plaintiff on Levaquin[12] and told him to stay off work, wear an athletic supporter, and refrain from heavy lifting.  [R227-31].

On August 22, 2006, Dr. Harrison noted that if Plaintiff's symptoms did not improve in two weeks, he wanted to schedule him for scrotal exploration.  [R226].  Dr. Harrison speculated that Plaintiff's "very strenuous job" likely exacerbated his condition.  [R226].

More than three years later, on October 9, 2009, Lisa Welch, M.D., reviewed the 2006 records from Dr. Carter and Dr. Raines and performed a consultative examination for the Agency.  [R236].  Plaintiff complained to Dr. Welch about bilateral hip pain (onset 2006) for which he took over-the-counter Aleve, joint pain in his knees and ankles (onset 2006), and epididymitis (onset 2006), which caused pain on walking.  [R236].  Plaintiff reported that he stopped seeing Dr. Carter and was unable to have the masses in his testicles removed in 2006 because he lost his job and insurance when he was unable to work due to stiffness and pain.  [R236].  Plaintiff stated that he could

_____

3/27/15).

[12]     Levaquin is a brand name for levofloxacin, an antibiotic medication. M e d l i n e P l u s ,   L e v o f l o x a c i n , http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697040.html   (last   visited 3/27/15).

10

AO 72A
(Rev.8/8
2)

perform activities of daily living but could not do any heavy lifting, walking, or bending, and therefore could not mow grass or vacuum, and he reported taking six Aleve tablets each day.  [R236].

Dr. Welch observed that Plaintiff had no difficulty walking down the hallway, getting on the exam table, or taking his shoes off, although he was wearing a truss and his hip joints appeared to be stiff after sitting for ten minutes.  [R236-37].  She also noted that Plaintiff had pain with external rotation of his hips bilaterally, decreased range of motion in his hips and knees, and crepitus in his knee joints, although x-rays of his bilateral hips were unremarkable and he had no spasms, tenderness, effusions, deformities, or trigger points.  [R237-45].  There is no indication that Dr. Welch examined Plaintiff's scrotum.  [R235-45].

Dr. Welch diagnosed bilateral hip pain, knee and ankle pain, and epididymitis. [R239].  She stated that she thought Plaintiff would benefit from better pain management for his knee, ankle, and hip pain, an evaluation by an orthopedist, and an evaluation by a urologist for his epididymitis.  [R239].  She opined that he could perform light work requiring frequent or occasional postural limitations: Plaintiff could stand and walk about six hours in an eight-hour workday; sit fewer than six hours in an

11

eight-hour workday; did not require an assistive device to ambulate; and could lift or carry ten to twenty pounds frequently or occasionally.  [R237-45].

On April 26, 2010, Plaintiff went to the Grady Health System emergency room with abdominal pain and symptoms of reflux.  [R293-94].  Doctors assessed Gastroesophageal Reflux Disease ("GERD"), prescribed Zantac, and referred Plaintiff to orthopedics, internal medicine, and urology.  [R294-308].

On May 5, 2010, Lee Murray, M.D., examined Plaintiff for the Agency.  [R248]. Plaintiff's chief complaints were hip and joint pain, epididymitis, GERD, and depression.  [R248-49].  Plaintiff reported that despite medication, his testicle was the size of a softball, with a pinching, stabbing, and burning pain located in his groin area, especially in the left testicle.  [R249].  He described the groin pain on a ten-point scale as eight-to-ten without medication and as six-to-eight with over-the-counter pain medication.  [R249].  He also reported sharp throbbing pain in his hip joint, sharp pains in his lower back that radiate down to his foot, and pain in his knees that radiates up the leg to the groin area.  [R249].  He indicated that his pain is worse when he is lifting, walking, standing, or sitting, and that it is reduced with medication and rest. [R249-50].

12

Plaintiff reported that he was able to attend to his personal needs, stand, sit, recline, walk greater than 100 feet, climb stairs, travel without difficulty, shop for groceries, clean his home, do his laundry and make his bed, prepare his own food, lift thirty pounds from the floor, and handle paperwork. [R250]. Plaintiff denied any other genitourinary symptoms, including flank pain. [R250].

Dr. Murray's examination revealed some cervical and lumbar spasm with tenderness. [R251]. Plaintiff was unable to perform heel-to-toe walking and had positive supine straight-leg raising bilaterally. [R253, 256]. X-rays were unremarkable. [R257-58, 261-64]. There is no indication that Dr. Murray examined Plaintiff's scrotum. [R247-64].

Dr. Murray diagnosed hip and joint pain, epididymitis, GERD, and depression. [R251]. He opined that Plaintiff could sit for eight hours; stand and walk up to four hours; bend, kneel, crawl, stoop, and crouch occasionally with moderate difficulty; and push and pull without limitation; and that he would have no limitation in lifting with both hands. [R252-58, 261-64].

In a Physical Residual Functional Capacity Assessment dated July 7, 2010, reviewing physician Carol Silver, M.D., opined that Plaintiff could perform medium work with postural limitations, including "frequent" climbing ramps and stairs,

13

balancing, stooping, and kneeling, "occasional" crouching and crawling, and never climbing ladders, ropes, or scaffolds. [R269-76].

On August 8, 2010, Plaintiff underwent a consultative psychological assessment with Steven Snook, Ph.D. [R265-68]. Plaintiff stated that he was unable to work because he had bursitis in his hip, was in constant pain, and his scrotum was "swollen up." [R267]. Dr. Snook found that Plaintiff's memory functions, insight, and judgment were intact and that he was able to maintain attention and sustain concentration throughout the interview. [R268]. He opined that he expected Plaintiff to be able to maintain adequate attention and sustain concentration at tasks, comprehend and carry out both simple and complex instructions adequately, adhere to work schedules, meet appropriate production norms in a workplace setting, and interact with peers, supervisors, and the general public. [R268].

E.   *Vocational Expert Testimony*

Vocational expert witness ("VE") Joann Hayward, Ph.D., stated that Plaintiff's past work was as a diesel mechanic, a construction worker, painter, and window glazier. [R91]. She testified that if a hypothetical individual was of Plaintiff's age, education, and vocational background, and could lift or carry twenty pounds occasionally and ten pounds frequently; could walk or stand a total of four hours in an eight-hour day; could

14

sit for up to six hours in an eight-hour day, but would require an at-will sit/stand option; could occasionally push or pull with the lower extremities; could occasionally climb stairs, bend, stoop, kneel, crouch or crawl; and could not climb ladders or scaffolds, work at heights, work with hazardous machinery, or operate a motor vehicle, that person could not perform Plaintiff's past work, but could perform light work as a glass checker, ticket seller, or mail clerk. [R92]. Dr. Hayward further testified that if the same hypothetical person were additionally limited to lifting or carrying ten pounds occasionally or lighter objects frequently, and walking or standing a total of two hours in an eight-hour day, the person could perform sedentary work such as an eyedropper assembler, silverware wrapper, or ticket checker. [R93]. Finally, Dr. Hayward testified that if the person were able to walk or stand for a total of two hours a day but could do so for only fifteen minutes at a time, there were no jobs that person could perform. [R93].

### III.   ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.   The claimant has not engaged in substantial gainful activity since May 17, 2006, the alleged onset date (20 CFR 404.1571 *et seq*.).

15

3.    The claimant has the following severe impairments: bursitis of the hip and osteoarthritis of the lower extremities (20 CFR 404.1520(c)).

. . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently.  He can walk or stand up to four hours and he can sit up to six hours in an eight-hour day, with the option to sit or stand at will.  He can occasionally push or pull with his lower extremities, climb stairs, bend, kneel, crawl, stoop, or crouch.  He cannot climb ladders or scaffolds, work at heights, work with hazardous machinery, or operate a motor vehicle.

. . .

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

. . .

7.    The claimant was born on December 1, 1966 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

16

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

. . .

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 17, 2006, through the date of this decision (20 CFR 404.1520(g)).

[R37-47].

The ALJ explained that the medical evidence of record and Plaintiff's activities show that he is not as limited as alleged.  [R42].  First, the ALJ stated that she found Plaintiff's epididymitis to be a non-severe impairment because the condition "fail[ed] . . . to remain acute for a prolonged period."  [R39].  Specifically, she noted that x-rays had been negative, Dr. Raines had released Plaintiff from work restrictions, and Dr. Harrison had prescribed an antibiotic, instructed Plaintiff to wear an athletic supporter and refrain from heavy work, and told Plaintiff that he would consider

17

exploration of the scrotum if his condition did not improve.  [R42, 44].  Second, the ALJ noted that Dr. Welch was aware of Plaintiff's reports of hip, knee, and ankle pain, observed hip stiffness occurring after Plaintiff sat for approximately ten minutes, and was aware of the fact that he was wearing a truss for epididymitis, yet she found upon examination that despite some decreased range of motion in the hips and pain in the knees and ankles, Plaintiff's strength was full, his gait was normal, and x-rays of the hips were unremarkable, and she concluded that Plaintiff should be able to sit, stand, or walk eight hours each day and could lift twenty pounds occasionally.  [R42].  Third, the ALJ remarked that Plaintiff had also raised his history and complaints of pain and epididymitis with Dr. Murray, yet upon examination, Dr. Murray found that while Plaintiff had hip and joint pain, difficulty heel-toe walking, epididymitis, mild difficulty getting up, and a limping gait, he also had full strength, intact sensation, the ability to stoop, the ability to half squat, the ability to pick up objects from the floor, no need for an assistive device, and x-ray studies of both knees were unremarkable, and therefore Plaintiff had the ability to sit up to eight hours, stand or walk up to four hours, occasionally bend, kneel, crawl, stoop, and crouch, and was unlimited in lifting, reaching, handling, or feeling.  [R43-44].  Fourth, the ALJ stated that when Plaintiff complained about the epididymitis, "he disclosed that he had the condition for several

AO 72A
(Rev.8/8
2)

years and did not refer to any circumstance that concerned its sudden exacerbation," which she found, combined with Dr. Raines's opinion that Plaintiff could go back to work, an April 2010 notation from Grady that he had full range of motion in his extremities and normal muscle tone, and Plaintiff's failure to use any treatment other than over-the-counter medication, "may reflect the minimal nature of [his] impairments, rather than his ability to afford care." [R44]. Fifth, the ALJ stated that Plaintiff's reports of his daily activities and the opinions of the consultative examiners were consistent with the limited range of light work encompassed in the RFC. [R44-45]. Sixth, the ALJ noted that the VE had testified that occupations were available to Plaintiff both at that RFC and even with further restrictions at the sedentary level. [R46-47]. The ALJ also remarked that Dr. Snook had opined that Plaintiff could interact appropriately with his peers, maintain attention and concentration, and was capable of maintaining a work schedule and meeting production norms. [R40].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

19

12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities.

*See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience.   *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can   perform   other   work   besides   past   relevant   work.   *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the   sequential   evaluation   ceases   and   further   inquiry   ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step

21

five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## V.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529

AO 72A
(Rev.8/8
2)

(11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff contends that the ALJ's credibility analysis was flawed because she summarily stated that Plaintiff's assertions about the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with her RFC determination and because the ALJ erroneously discounted Plaintiff's scrotal pain and his inability to afford treatment.  [Doc. 10].  The Court will address each argument in turn.

### A.   *Description of Allegations as Inconsistent with RFC*

Plaintiff first points out that the ALJ found that Plaintiff's assertions about the "intensity, persistence, and limiting effects of his symptoms" were not credible to the extent that they are inconsistent with his RFC.  [Doc. 10 at 11[13] [citing R42]].  He asserts that because "it goes without saying that the ALJ assessed an RFC that reflects her credibility findings, . . . this statement tells the Court nothing about the reasoning behind her decision."  [Doc. 10 at 11 (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981))].

---

[13]    The original pagination in Plaintiff's opening brief differs from the pagination assigned by the Court's CM/ECF system.  [*See* Doc. 10].  The Court's pinpoint citations to that document use the page numbers assigned by the CM/ECF system.

AO 72A
(Rev.8/8
2)

The Court finds this portion of Plaintiff's credibility appeal to be without merit. It is true that where an ALJ decides not to credit a claimant's testimony regarding subjective allegations of disability, she must articulate explicit and adequate reasons for doing so. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Be that as it may, in rejecting such testimony, the ALJ does not need to refer specifically to each piece of evidence in her decision, so long as the decision "is not a broad rejection" that does not allow the reviewing court to determine that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1211.

Here, the ALJ did not simply issue a broad rejection of Plaintiff's testimony regarding the subjective effects of his symptoms but instead, she considered Plaintiff's overall medical condition and placed on the record explicit reasons for rejecting his testimony and finding that his impairments were not severe enough to be disabling. *See* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (providing that in evaluating subjective complaints, the ALJ must "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence"). For example, the ALJ noted that x-ray studies were negative throughout the relevant period; at acute onset in 2006, the range of motion in Plaintiff's hips was full, there was no significant swelling,

25

anti-inflammatories and warm compresses helped relieve his pain, and he declined a corticosteroid injection; Dr. Raines released Plaintiff back to work in June 2006; Dr. Carter advised Plaintiff to refrain from heavy work; Plaintiff reported to Dr. Welch and Dr. Murray that over-the-counter pain medication gave him some relief; Dr. Welch observed that Plaintiff walked down the hallway, had a normal gait, had full strength, and got on the examination table without difficulty despite some decreased range of motion in the hips as well as pain in the knees and ankles; Dr. Welch opined that Plaintiff was able to sit, stand, or walk eight hours each day and lift twenty pounds occasionally; Dr. Murray found that although Plaintiff had mild difficulty getting up from his chair, had difficulty toe and heel walking, and had a limping gait, he had full strength, intact sensation, the ability to stoop, the ability to half squat, and the ability to pick up objects from the floor; Dr. Murray opined that Plaintiff could sit up to eight hours and stand or walk up to four hours as well as occasionally bend, kneel, crawl, stoop, and crouch, had no need for an assistive device, and had no problems lifting, reaching, handling, or feeling; and Plaintiff was noted to have a full range of motion in his extremities and normal muscle tone in April 2010.  [R42-45].  The ALJ also explained that she gave considerable weight to the opinions of all of the medical sources because they were well-reasoned, supported by the medical evidence as a

26

whole, and consistent with one another.  [R45].  She also explained that it was because of Plaintiff's obesity and evidence of his difficulty with certain movements that she had determined that Plaintiff was capable of only light work; that she had included a sit/stand option in the RFC to accommodate Plaintiff's claimed need to be able to move around to avoid pain; and that she had limited Plaintiff from climbing ladders, working at heights, working with hazardous machinery, or operating a motor vehicle to accommodate Plaintiff's alleged difficulty concentrating due to pain, side effects of medication, and depression.  [R44].

It is therefore clear that the ALJ's credibility determination was not an impermissibly broad rejection of Plaintiff's testimony, as Plaintiff seems to suggest, but was instead a detailed, generally well-reasoned explanation. *See Dyer*, 395 F.3d at 1210-11; *Holt*, 921 F.2d at 1223; SSR 96-7p.  Consequently, the Court finds that this portion of Plaintiff's argument provides no grounds for reversal.

### B.    *The ALJ's Pain Analysis*

The Court now turns to Plaintiff's argument that the ALJ did not properly consider the evidence of pain arising from his epididymitis.  In support of this contention, Plaintiff first takes issue with the ALJ's assertion that the failure of his epididymitis "to remain acute for a prolonged period leads to the conclusion that it is

27

a non-severe impairment." [Doc. 10 at 12 [quoting R39]]. He argues that she did not

adequate explain why the condition—which the ALJ acknowledged persisted for at

least six months—could not cause greater effect on Plaintiff's ability to perform

work-related functions—particularly, his ability to concentrate, lift, or walk.

[Doc. 10 at 12-13]. He claimed at oral argument that *Himes v. Comm'r of Social Sec.*,

585 Fed. Appx. 758, 767-68 (11th Cir. Sept. 26, 2014), required the ALJ to discuss all

of his diagnosed impairments, including those the ALJ viewed as non-severe, in

formulating a Social Security's claimant's RFC, and that the failure to consider

Plaintiff's epididymitis in this case was erroneous because all of his impairments,

including the non-severe ones, are interconnected. Second, he asserts that there is no

evidence to support the ALJ's determination that his June 2006 "episode" of

epididymitis ever "resolved." [*Id*. at 13-14 [quoting R39]]. He points out that there is

no evidence that Dr. Harrison ever released him back to work in 2006 and that the

evidence shows that he wore a truss to his examination with Dr. Welch; that he

complained to the consultative examiners that the epididymitis was causing him

swelling and pain; that over-the-counter medication reduced his pain to only to six-to-

eight out of ten, which is still considered moderately severe to intense pain; and that he

was referred to a urologist both by the consultative examiners and when he presented

28

to the Grady ER in April 2010 for abdominal pain.  [*Id.* at 13-14, 17].  He also notes

that although Dr. Raines released him to work, Dr. Raines only treated his bursitis and

not his epididymitis, and that the consulting physicians' notes do not indicate that their

"thorough examinations" included an examination of Plaintiff's scrotum.  [*Id*. at 14].

Plaintiff also asserts that the April 2010 ER notes showing normal muscle tone and full

range of motion in Plaintiff's extremities do not support the ALJ's determination

because "those signs fail to reflect the pain and limitations imposed by a swollen

scrotum" and that those signs did not present an accurate picture of Plaintiff's

limitations because other evidence supported his allegations of hip and joint pain,

which could be related to the epididymitis.  [*Id.* at 17 & nn.83-84

[citing R237-45, 251, 253]].  Third, Plaintiff points out the tension between the ALJ's

observation that when Plaintiff first complained about the epididymitis to Dr. Carter,

he disclosed that the condition was chronic and "did not refer to any circumstance that

concerned its sudden exacerbation," [*id.* [quoting R44]], and Dr. Harrison's speculation

that Plaintiff's "very strenuous job" exacerbated his condition, [Doc. 10 at 14-15

[quoting R226]].  Fourth, Plaintiff argues that once evidence has been presented that

supports a finding that a given condition exists, it is presumed, in the absence of proof

to the contrary, that the condition remains unchanged, [Doc. 10 at 15 (citing *Simpson*

AO 72A
(Rev.8/8
2)

*v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982) (superseded by statute on other grounds as stated in *Hand v. Heckler*, 761 F.2d 1545, 1547-48 & n.4 (11th Cir. 1985))], and asserts that while hydroceles often go away on their own in children, they do not do so in adults, [Doc. 10 at 15 & n.65 (citing MedlinePlus, Hydrocele Repair, http://www.nlm.nih.gov/medlineplus/ency/article/002999.htm)]. Fifth, Plaintiff argues that his activities of daily living are not inconsistent with his allegations of pain or sufficient to establish that he has the ability to perform even sedentary work. [Doc. 10 at 15-16 (citing *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) ("[P]articipation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability.); *Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1252 (N.D. Ala. 2003) ("It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores . . . .")]. Finally, Plaintiff argued at oral argument that what Plaintiff described at the evidentiary hearing as problems walking when he "moves too fast" really means walking normally. [*See* R71].

The ALJ's decision is, of course, not perfect. In particular, the ALJ's note that Plaintiff did not refer to any circumstance that concerned the exacerbation in June 2006 of his chronic epididymitis is of dubious relevance, given Dr. Harrison's speculation

30

that the condition was linked to Plaintiff's strenuous work.  [*See* R44, 226].  The characterization of the epididymitis Plaintiff experienced in June 2006 as an "episode" that had been "resolved" is also questionable, as the phrasing could be read to imply that the epididymitis ceased.  [*See* R39].  It is also true that the ALJ did not expressly acknowledge that Plaintiff reported over-the-counter medication reducing his pain to only six-to-eight on a ten-point scale.  [R249].

The Court finds, however, that there is no reversible error in the ALJ's evaluation of Plaintiff's credibility as to his claims of pain arising from his epididymitis.  As to Plaintiff's suggestion that the ALJ erred by finding that the epididymitis was not a severe impairment, "[n]othing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe."  *Heatly v. Comm'r of Soc. Sec.*, 382 Fed. Appx. 823, 824-25 (11ᵗʰ Cir. June 11, 2010) (per curiam).  Instead, it is enough if at step two the ALJ finds that the plaintiff has any severe impairment and, at step three, makes specific and well-articulated findings demonstrating that she has considered the effects of all of the claimant's impairments—severe or not—in combination. *Id*. (citing *Jamison v. Bowen*, 814 F.2d 585, 588 (11ᵗʰ Cir. 1987); *Bowen v. Heckler*, 748 F.2d 629, 635 (11ᵗʰ Cir. 1984)).  It also is significant, as pointed out by

31

the Commissioner at oral argument, that Plaintiff did not raise the ALJ's failure to include Plaintiff's epididymitis as a severe impairment as a separate claim of error.

Here, the ALJ found that Plaintiff had severe impairments of bursitis of the hip and osteoarthritis of the lower extremities and expressly stated that although she found the epididymitis to be a non-severe impairment, she considered the effects of the epididymitis along with the effects of all of Plaintiff's other severe and non-severe impairments in analyzing his capacity for work. [R39]. She then discussed Plaintiff's testimony and medical history, including his complaints, his allegations of limitations due to pain, his physicians' clinical observations, and the physicians' diagnoses, opinions, and recommendations. [R40-44].[14]

The Court is also unpersuaded that any of Plaintiff's other allegations of error require reversal. First, it is clear that the ALJ recognized that Plaintiff's epididymitis did not resolve completely but that she instead found that the evidence showed that it did not remain so acute as to preclude light work. [*See* R39 (stating that the condition did not remain acute); R42 (noting that Plaintiff wore a truss to see Dr. Welch and that

---

[14]     The Court rejects Plaintiff's recharacterization of his testimony at the evidentiary hearing, [R71], that "moving too fast" is just normal speed for everyone else. The Court's role is not to judge Plaintiff's credibility, but only to determine whether substantial evidence exists supporting the ALJ's credibility choices upon application of the proper legal standards.

AO 72A
(Rev.8/8
2)

she diagnosed epididymitis); R43 (noting that Dr. Murray diagnosed epididymitis and instructed Plaintiff to see a urologist)].  Thus, *Himes* is inapposite because it is clear that the ALJ considered and weighed Plaintiff's non-severe impairments as well. Second, the Court is unconvinced of the materiality of the absence of notes showing that the consulting physicians examined Plaintiff's scrotum or Plaintiff's theory that his hydrocele should be presumed to have persisted, given that the consultative examiners did consider Plaintiff's epididymitis in evaluating his functional capacity and that the severity of a medically ascertained disability "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1988); *accord Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) ("A diagnosis alone is an insufficient basis for a finding that an impairment is severe.").  Third, the Court finds that the ALJ did not commit reversible error by failing to expressly acknowledge Plaintiff's complaint to Dr. Murray that over-the-counter medication reduced his pain to only six-to-eight on a ten-point scale, as it is clear that the ALJ reviewed Dr. Murray's report, [*see* R43], and Plaintiff's other allegations of pain, [R41-44], and, as noted above, there is no requirement that an ALJ discuss on an individual basis every notation in the record or every allegation the

33

plaintiff raises.  *See Cooper v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 803, 808-09 (11th Cir. June 6, 2013) ("Despite [the plaintiff's] assertions to the contrary, the ALJ stated that he considered the record in its entirety, and he was not required to discuss every piece of evidence in denying her application for disability benefits.") (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)); *Dyer*, 395 F.3d at 1211. Fourth, the lack of evidence that Dr. Harrison released Plaintiff back to work in 2006 does not undermine the ALJ's decision because the record shows that Dr. Harrison directed Plaintiff to avoid heavy work, which was the exertional level of the job Plaintiff had at the time, [R91, 226-27], and moreover, the disability determination is within the purview of the ALJ, *see Green v. Soc. Sec. Admin.*, 223 Fed. Appx. 915, 923 (11th Cir. May 2, 2007) (per curiam) ("Although a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ.") (citing 20 C.F.R. §§ 404.1513, 404.1527, 404.1545).  Fifth, review of the ALJ's decision shows that she did not, as Plaintiff implies, heavily rely on his report as to his activities of daily living in order to reach the finding of non-disability, but instead simply found, after reviewing the medical and testimonial evidence, that his reported activities of daily living were also consistent

34

with a light level of exertion, [*see* R44].  *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (per curiam) (noting that although daily activities are generally not considered "substantial gainful activity," the regulations "do not . . . prevent the ALJ from considering daily activities in the fourth step of the sequential evaluation process"); *see also Harwell v. Heckler*, 735 F.2d 1293, 1293 (11th Cir. 1984) (per curiam) (affirming the credibility determination where the record showed that the ALJ considered "a variety of factors, including the claimant's use of pain-killers and his daily activities, in making the finding about pain").

Moreover, substantial evidence supports the ALJ's determination of non-disability.  As noted above, at acute onset in 2006, the range of motion in Plaintiff's hips was full, there was no significant swelling, anti-inflammatories and warm compresses helped relieve his pain, and he declined a corticosteroid injection; Dr. Raines released Plaintiff back to work in June 2006; Dr. Carter and Dr. Harrison advised Plaintiff to refrain from heavy work; Plaintiff reported to Dr. Welch and Dr. Murray that over-the-courter pain medication gave him some relief; Dr. Welch observed that Plaintiff walked down the hallway, had a normal gait, had full strength, and got on the examination table without difficulty despite some decreased range of motion in the hips as well as pain in the knees and ankles; Dr. Welch opined that

35

Plaintiff was able to sit, stand, or walk eight hours each day and lift twenty pounds occasionally; Dr. Murray found that although Plaintiff had mild difficulty getting up from his chair, had difficulty toe and heel walking, and had a limping gait, he had full strength, intact sensation, the ability to stoop, the ability to half squat, and the ability to pick up objects from the floor; Dr. Murray opined that Plaintiff could sit up to eight hours and stand or walk up to four hours as well as occasionally bend, kneel, crawl, stoop, and crouch, had no need for an assistive device, and had no problems lifting, reaching, handling, or feeling; and Plaintiff was noted to have a full range of motion in his extremities and normal muscle tone in April 2010.  [R42-45].  Additionally, the ALJ explained that her determination that Plaintiff had no limitations in terms of concentration, persistence, or pace was based on Dr. Snook's opinion that Plaintiff was capable of maintaining attention and concentration, [R40], and that Plaintiff's walking and lifting capabilities were supported by his own reports and the testimony Plaintiff provided in response to the ALJ's questioning, [R41-42 (noting that Plaintiff alleged greater limitations upon questioning by his attorney); R66-68 (can lift and carry ten to fifteen pounds "over and over again"); R71, 87 (epididymitis requires him to "glide" when he walks but does not bother him unless he moves quickly, runs, jumps, or tries

36

to lift heavy things); R250 (Plaintiff's report that he can stand, sit, recline, walk greater than 100 feet, climb stairs, and lift thirty pounds from the floor)].

For all of these reasons, the undersigned finds no grounds for reversal in Plaintiff's allegations that the ALJ erred in her pain analysis.

### C.   *Inability to Afford Treatment*

Finally, Plaintiff argues that the ALJ rejected his proffered reason for infrequent medical treatment and lack of prescription medication—that he could not afford it—and that the rejection is not supported by substantial evidence. [Doc. 10 at 16-19]. In essence, he argues that the evidence supports his assertion that non-conservative treatment was warranted but that he could not afford it. [*Id*. at 16-17]. He points to Dr. Harrison's August 2006 notes regarding plans for surgery if Plaintiff's symptoms did not improve, [R226], the timing of the loss of his job and insurance, and the consistency of his testimony with his statements to consultants regarding planned surgery that had been cancelled due to the loss of Plaintiff's insurance, [R74-77, 226, 236, 248, 267]. [Doc. 10 at 16-17].

It is true that where there is a prescribed treatment that could remedy or control the claimant's disabling condition but he cannot afford the treatment and can find no way to obtain it, his poverty may excuse his noncompliance. *Dawkins v. Bowen*,

37

848 F.2d 1211, 1213 (11th Cir. 1988) (reversing a denial of benefits and remanding the case because the ALJ's determination of non-disability was "inextricably tied to the finding of noncompliance" and the ALJ had failed to consider the claimant's ability to afford the prescribed medical treatment).  An ALJ is not required to accept the poverty explanation, however, where there is other substantial evidence indicating that the claimant is not disabled.  *See, e.g., Belle v. Barnhart*, 129 Fed. Appx. 558, 560 & n.1 (11th Cir. Apr. 26, 2005) (per curiam) (determining, despite finding that the claimant's diabetes was poorly controlled because his financial status made it difficult to obtain medication, that the claimant's allegations of pain were not credible because the diabetes improved with insulin, his other functions were normal, and he was generally in good health); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) (holding that the ALJ's failure to consider the claimant's ability to afford his seizure medication was not reversible error because the ALJ did not significantly base his decision that the claimant was not disabled on a finding of noncompliance).

The Court finds no error in the ALJ's consideration of Plaintiff's inability to afford treatment.  The ALJ did base her determination of non-disability, in part, upon the three-year gap in treatment and Plaintiff's reliance on over-the-counter pain medication.  [R44-45].  She explained, however, that she did not draw conclusions

solely from the gap in treatment, and that she instead gave substantial weight to the opinions of the consultative examiners.  [R45].  Additionally, in considering the persuasive value of the lack of treatment, the ALJ acknowledged Plaintiff's explanation that he was maintained on medication treatment for epididymitis because he lost his job and was unable to afford surgical treatment, [R43], yet explained that she did not fully credit the explanation, given the full range of motion in his extremities and normal muscle tone found in April 2010, [R44], conditions unlikely to be found in a person as impaired as Plaintiff claimed to have been for the previous four years.

The undersigned therefore concludes that the ALJ did not err in her consideration of Plaintiff's inability to afford more aggressive treatment.

## VII.  CONCLUSION

For the reasons above, the Court **AFFIRMS** the final decision of the Commissioner.   The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

**IT IS SO ORDERED and DIRECTED,** this the 30th day of March, 2015.

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**